## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | |
|---|---|
| WILLIAM CHRISTOPHER YARBROUGH, )<br>)<br>**Plaintiff,** )<br>v. )<br>)<br>HENDERSON COUNTY, TENNESSEE; )<br>JENNIFER DAVIS; JACKIE BAUSMAN; )<br>GARY SIMPSON; AUSTIN OWEN; )<br>WENDI EITLEMAN; CORDERO STATEN; )<br>TAYLOR STEGALL; KRISTI COTTON; )<br>And JESSILYN MARSHALL, )<br>)<br>**Defendants.** ) | **No. 21-cv-01074-STA-jay** |

---

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff William Christopher Yarbrough[1] filed this action pursuant to 42 U.S.C. § 1983

against Defendants Henderson County, Tennessee, and its employees Jennifer Davis, Jackie

Bausman, Gary Simpson, Austin Owen, Wendy Eitleman, Cordero Staten, Taylor Stegall, Kristi

Cotton, and Jessilyn Marshall in their individual capacities.   Plaintiff alleges that Defendants

violated his civil rights during his pretrial detention by being deliberately indifferent to his serious

medical needs. Defendants Henderson County, Bausman, Simpson, Owen, Eitleman, Staten,

Stegall, Cotton, and Marshall have filed a motion for summary judgment.[2]  (ECF No. 52.) Plaintiff

has filed a response to the motion (ECF No. 57), and Defendants have filed a reply to the response.

---

[1] Plaintiff is alternatively referred to as "LaShon" in the briefs.
[2]  Defendant Nurse Jennifer Davis has also filed a motion for summary judgment.  (ECF No. 53.)
That motion will be addressed in a separate order.

(ECF No. 66.)   For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the non-moving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>Statement of Material Undisputed Facts</u>

Pursuant to the Local Rules of this Court, Defendants have prepared a statement of material undisputed facts (ECF No. 52-2) "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). Plaintiff has responded to Defendants' statement and has attached his own statement of facts. (ECF No. 57-30.) Defendants have responded to Plaintiff's statement of facts. (ECF No. 67.)

A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). Here, as the non-moving party, Plaintiff must respond to Defendants' statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

If Plaintiff asserts that a genuine dispute of material fact exists, he must support his contention with a "specific citation to the record." Local Rule 56.1(b). If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed.

3

R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In the present case, both parties object to certain portions of the opposing party's statement of facts.

The Court finds that there is no genuine dispute as to the following material facts, unless otherwise noted.[3]

On May 15, 2020, Lexington Police Department ("LPD") officers arrested Plaintiff for domestic assault and resisting arrest. The events leading up to the arrest are as follows.[4] For several days prior to his arrest, Plaintiff's parents ("Mr. and Mrs. Yarbrough") had concerns about his mental well-being, as he was progressively agitated, confused, paranoid, and delusional - behaviors that the family had not witnessed in him before. Upon first observing concerning symptoms on April 28, 2020, Mr. and Mrs. Yarbrough convinced Plaintiff to be evaluated by a mental health professional and transported him to the Jackson-Madison County General Hospital ("JMCGH") emergency room, where he was referred to Pathways Behavioral Health Center. Plaintiff went voluntarily. Mrs. Yarbrough accompanied him to the Pathways facility.

---

[3] The facts are stated for the purpose of deciding this motion only.

[4] Defendants state that they have no knowledge of the events leading up to the arrest and do not dispute Plaintiff's version of those events except to the extent that Plaintiff attempts to establish a mental health diagnosis through his recitation of pre-arrest events. (Defs' Resp. to Pl's St. of Mat. Fct. ¶¶ 1–5, ECF No. 67.) The Court has viewed Plaintiff's recitation of these events as background only.

Upon returning home, Plaintiff's symptoms did not improve, so Mrs. Yarbrough called Pathways in an attempt to get guidance and further care for her son; she was told that he could make a telehealth appointment but that would not be immediate. She then attempted to call a Christian counseling center, but they too could not see Plaintiff for several weeks.

On or about May 6, 2020, Plaintiff went missing, and Mrs. Yarbrough called local law enforcement to help locate him, only to be told that nothing could be done to assist her because Plaintiff was an adult. He was later seen walking through town wearing only shorts and yelling that he was the Messiah. His aunt eventually found him sitting on a stranger's porch and brought him home.

Between April 28 and May 15, 2020, Plaintiff's paranoia, fixation, delusions, and hallucinations increased, and he slept sporadically and only when one of his parents would lie down with him - all behaviors he had never exhibited before.[5] Eventually, Mr. and Mrs. Yarbrough did not feel that Plaintiff would be safe if left alone, and they made sure that one of them was with him at all times.

Mr. and Mrs. Yarbrough asked Kristy Fry, a nurse, for a recommendation for further mental health evaluation and treatment. Ms. Fry suggested Lakeside Behavior Health ("Lakeside") in Memphis, Tennessee, and reached out to them on May 14, 2020, to see when Plaintiff could be transported. Arrangements were made for Plaintiff to be evaluated at Lakeside on Saturday, May 16, 2020, between 9:00 a.m. and 10:00 a.m.[6]

---

[5] Again, this pre-arrest description of Plaintiff's behavior is background only and not a mental health diagnosis.

[6] Defendants point out that they were not aware of the arrangements for Plaintiff to be evaluated at Lakeside until, on the afternoon of May 16, 2020, Defendant Staten was told by Mr. Yarbrough that the family had reached out to Lakeside. Defendant Staten informed Defendants Cotton and Nurse Davis of his conversation with Mr. Yarbrough. Lakeside also provides substance abuse treatment. (Defs' Resp. to Pl's St. of Mat. Fct. ¶¶ 11–12, ECF No. 67.)

On May 15, 2020, Plaintiff's brother graduated from high school.  Plaintiff did not attend the ceremony with his family. Mrs. Yarbrough asked her father, William Fry, to sit with Plaintiff while the other family members attended the graduation.

When the family returned home, Plaintiff was paranoid, agitated and confused, and unable to recognize Mr. Yarbrough as his father. When he threatened to run away, Mr. Yarbrough panicked and asked Mrs. Yarbrough to call Ms. Fry, who came to the Yarbrough home to assist. Plaintiff similarly did not recognize Ms. Fry, and the family decided that law enforcement should be called to secure Plaintiff immediate help.

LPD Officers arrived and explained to Mr. Yarbrough that Plaintiff would need to be charged with some criminal offense to get the help he needed, so Mr. Yarbrough stated that Plaintiff had assaulted him. Plaintiff was arrested and taken to the Jail. Plaintiff was taken into custody for domestic assault and resisting arrest while also being placed on a "psych hold."

A "psych hold" is a slang term used in the law enforcement and correctional setting for the procedure describe in Tennessee Code Annotated Section 33-6-401 *et seq*., entitled "Emergency Involuntary Admission to Inpatient Treatment."[7]

After they arrested Plaintiff, LPD officers transported Plaintiff to the Henderson County Jail. Before arriving at the Jail, LPD called the Jail and informed Defendant Simpson, the booking officer, that Plaintiff was combative and needed to be placed in a restraint chair. As a result, Defendant Simpson radioed the sergeant on duty to inform him of the conversation with the LPD

---

[7] Defendants state that the term "psych hold" can include individuals detained under Tennessee Code Annotated § 33-6-401. However, the term "psych hold" does not necessarily mean that a detainee is being detained under Tennessee Code Annotated § 33-6-401. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 20, ECF No. 67.)

officer. Defendant Owen — though he was not assigned to booking — and other officers then proceeded to the booking area to assist in restraining Plaintiff.

LPD officers arrived in the sally port area of the Jail with Plaintiff around 10:00 p.m. Once Plaintiff exited the patrol car, Plaintiff abruptly "took off running," and ran straight into the sally port door with his "full body." LPD officers reported to Owen that they believed Plaintiff was under the influence of drugs.[8] Plaintiff's behavior at intake was consistent with that of an intoxicated person.[9]

Defendants Simpson and Owen along with other officers used soft hand techniques to restrain Plaintiff and place him in a restraint chair at 10:03 p.m.[10] Once Plaintiff was restrained, Defendant Simpson observed bumps on Plaintiff's head and an injured toenail. Defendant Simpson informed a jail nurse that Plaintiff had been placed in a restraint chair and that he appeared to have an injured toenail. Officers then rolled Plaintiff in the restraint chair into the booking area where he could be monitored and clearly observed.

As part of the typical booking process, inmates are asked a series of general and medical questions. While Plaintiff remained in the restraint chair, Defendant Simpson attempted to initiate the booking process, including going through the medical questionnaire with Plaintiff, but Plaintiff did not cooperate during this process. It is unclear as to whether Plaintiff had the capacity to

---

[8] Plaintiff adds that the arresting officer relayed to Simpson, the booking officer, that he was brought in on charges of domestic assault, resisting arrest, and for a "psych hold," and Simpson entered that information in the booking report. (Pl's St. of Mat. Fct. ¶ 25.) Defendants add that Simpson testified that a "psych hold" indicated "that the officer or someone relayed a message that they believe he might have the possibility of mental illness." (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 26.)

[9] Plaintiff notes that his behavior was consistent with either mental illness or intoxication. (Pl's Resp to Defs' St. of Mat. Fct. ¶ 14.)

[10] Plaintiff adds that he was strapped into the restraint chair and his legs were shackled, thus immobilizing him. (Pl's St. of Mat. Fct. ¶ 24.)

cooperate. Throughout Simpson's shift, Plaintiff was unable to recite basic information, including the current date, the name of the President, his name, or his Social Security number.

Defendant Simpson successfully completed a COVID screening and performed a pat down search on Plaintiff.

Simpson was aware that Pathways was the on-call mental health provider and that, as the booking officer for an inmate with a "psych hold," Henderson County Jail Policy required that he call Pathways. However, Pathways will not accept intoxicated inmates for a period of at least twenty-four hours. Simpson was required to and did disseminate the fact that Plaintiff was under a psych hold to the other members of his shift, including Owen.

While Plaintiff was in the restraint chair during the night shift of May 15, 2020, log entries were made by Officers Simpson and Owen. During Owen and Simpson's checks on Plaintiff, which occurred every fifteen minutes while he was in the restraint chair, the officers noted once in the restraint chair log that Plaintiff attempted to hurt himself with foot restraints.

Plaintiff remained in the restraint chair until 2:50 a.m. At that time, Plaintiff had calmed down, and Defendant Simpson removed Plaintiff from the restraint chair and placed him in Cell 257A. Cell 257A is a cell in the booking area that allows officers to visually observe a detainee at all times. Cell 257A is directly in front of the booking desk.

Defendant Simpson did not recall observing Plaintiff hit his head on the door or cell from his release from the restraint chair at 2:50 a.m. until the end of his shift at 6:00 a.m. However, Defendant Simpson did not keep any observation logs after Plaintiff was released from the restraint chair. Defendant Owen resumed his shift duty in the control tower and did not observe Plaintiff after he was placed in the restraint chair except for entries he made in the restraint chair log at 2:04 a.m., 2:17 a.m., and 2:40 a.m.

Owen and Simpson were relieved at 6:00 a.m. on May 16, 2020, by shift commander Cotton, as well as Stegall, Staten, and Eitleman. Simpson notified the oncoming shift that Plaintiff was under a psych hold; that he had to be placed in the restraint chair; and instructed them to read his incident report. As the oncoming booking officer, Eitleman received a verbal report of what occurred on the prior shift and reviewed the booking reports, incident report, and logs completed during that time.

Around 7:30 a.m., Eitleman heard a loud sound from Plaintiff's cell. Eitleman went to the cell and observed Plaintiff standing near the door. Eitleman asked Plaintiff whether he hit his head on the door. Plaintiff informed Eitleman that he hit his head on the cell door but that he was not going to do so again. Satisfied with Plaintiff's response, Eitleman walked away.

A short time later, Defendant Eitleman observed Plaintiff hit his head on the cell door. After seeing Plaintiff hit his head on the door, Eitleman called Defendant Cotton — her superior officer — to assist in restraining Plaintiff. Defendant Cotton then called Defendants Staten and Stegall to assist in restraining Plaintiff. In the meantime, Plaintiff continued to run into the door and hit his head on the door.

In response, Defendant Cotton, along with Defendant Staten and Defendant Stegall went to assist. Upon arrival, Defendant Cotton verbally directed Plaintiff to back away from the door, but he did not comply. Defendants Eitleman, Cotton, Staten, and Stegall then opened Plaintiff's cell door, and Plaintiff attempted to rush out of the cell. Because Plaintiff attempted to rush out of his cell, Defendant Cotton administrated a one-second burst of pepper spray.

Plaintiff retreated inside his cell after Defendant Cotton sprayed him with pepper spray. Defendants Eitleman, Cotton, Staten, and Stegall then entered the cell. During the course of the struggle, Plaintiff bit both Defendant Eitleman and Defendant Staten. Eventually, Defendants

9

Staten and Stegall were able to get control of Plaintiff. Once they did so, Defendants Cotton, Eitleman, Staten, and Stegall placed Plaintiff in a restraint chair to prevent him from harming himself.[11] Plaintiff urinated and defecated on himself.  He was later placed in the shower to clean up.

Eitleman knew that Plaintiff was under a psych hold, had run into the sally port door, and had been placed in the restraint chair. Neither Simpson nor Eitleman contacted Pathways concerning Plaintiff.

Plaintiff was in the restraint chair from approximately 7:40 a.m. to 1:00 p.m. on May 16, 2020. The restraint chair was located in an open area outside the booking cells.

After Plaintiff was restrained, Defendant Cotton notified Nurse Davis, the nurse on duty, that Plaintiff had been placed in the restraint chair. Nurse Davis arrived in booking and attempted to take Plaintiff's vitals but was unable to do so because Plaintiff was combative and possibly delusional.[12]

Defendant Eitleman continued to observe Plaintiff while he remained in the restraint chair and logged her observations. Defendant Staten also monitored Plaintiff while he was in the restraint chair.

Nurse Davis checked on Plaintiff while he was in the restraint chair at 7:30 a.m., at 9:30 a.m., at 10:15 a.m., at 12:00 p.m., and at 12:20 p.m. Nurse Davis had physical contact with Plaintiff on May 16, 2020, at 7:30 a.m. when he was initially placed in the restraint chair, but she was

---

[11]  The parties dispute how many times Plaintiff "rammed" his head and shoulders into the cell door.  (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 47.)  Plaintiff suggests that it was fifteen times based on Officer Cotton's testimony, while Defendants point out that Officer Stegall testified that Plaintiff hit the door fewer than five times, Officer Staten testified that he hit the door five times or more, and Officer Eitleman testified that he hit the door twice. (*Id.*)

[12] The parties agree that Nurse Davis noted that Plaintiff "believed she was going to execute him and that the thermometer she was holding was a gun." (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 50.)

unable to get vital signs, and at 10:15 a.m. when she was able to obtain Plaintiff's blood pressure, pulse and temperature. All other checks on Plaintiff were visual observation with a steel cell door between them.

While Plaintiff was in the restraint chair, he repeatedly expressed delusional thoughts and hallucinated.[13]

At 1:00 p.m., Defendants Staten and Stegall removed Plaintiff from the restraint chair because Plaintiff had become calm enough to be released from it. He was placed in Cell 257A by Simpson.  Cell 257A contained no commode, bunk, bed sheets, or sink. Defendant Simpson testified that he placed Plaintiff in Cell 257A because he was under a psych hold and had to be placed in the restraint chair.

Prior to 2:30 p.m. on May 16, 2020, Defendant Staten, who is Plaintiff's cousin, spoke with Plaintiff's father and informed him about Plaintiff's condition.  Staten called Mr. Yarbrough "because of concern" for Plaintiff's well-being. During the conversation, Plaintiff's father mentioned that Plaintiff had been acting strangely and that, prior to arrest, the family had arranged to send him to Lakeside on May 16.  Staten reported the conversation to Cotton and Nurse Davis around 2:30 p.m. Defendant Cotton did not know Lakeside was a mental health facility.

When Nurse Davis learned that Plaintiff had been scheduled to go to Lakeside, she decided that Plaintiff needed a mental health assessment.

During Nurse Davis's observations of Plaintiff on May 16, 2020, she observed no injuries to Plaintiff outside of the minor injury to Plaintiff's big toe.  The only physical injuries suffered

---

[13] Defendants do not dispute this fact but reiterate that they were not mental health professionals, could not make a mental health diagnosis, and could not distinguish between whether Plaintiff was intoxicated and/or high or suffering from a mental episode. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 55.)

by Plaintiff that any officer observed during the day shift on May 16, 2020, were minor injuries to Plaintiff's right middle and right index finger, both of which were reported to Nurse Davis.

On May 16, 2020, neither Eitleman nor any other officers received or relied on any instructions from Nurse Davis or any other medical professional about Plaintiff's mental health or physical health outside of receiving a Bandaid and Neosporin for his injured toenail.[14]

At approximately 6:00 p.m., Defendants Eitleman, Cotton, Staten, and Stegall changed shifts, and Defendant Marshall began her shift as the booking officer. Upon arrival, Defendant Marshall reviewed all incident reports and other documentation concerning Plaintiff's actions in the prior shift. As part of Marshall's duties when coming on shift, she spoke to the outgoing booking officer about what occurred during the prior shift and reviewed all documents completed during that time including jail incident reports and shift logs. An inmate's placement in the restraint chair during a prior shift was routinely communicated and discussed.

Shortly after she arrived, Defendant Marshall observed Plaintiff "hollering" in his cell and saw food that had been thrown outside his cell door. Defendant Marshall observed Plaintiff hitting the door with his fist at that time. She also observed him hit his head at least once. Defendant Marshall saw Plaintiff hit the door with his fist at least ten times.

At around 7:00 p.m., Plaintiff calmed down, and Defendant Marshall gave Plaintiff a sandwich and a carton of milk. Throughout Defendant Marshall's shift, Plaintiff intermittently cried, yelled, and hit the door.

---

[14] Defendants do not dispute that Nurse Davis did not provide any instructions for further medical care or mental health care to correctional officers on May 16, 2020. However, they point to Nurse Davis' testimony that she believed no such care was needed after her assessments at 7:30 a.m., at 9:30 a.m., at 10:15 a.m., at 12:00 p.m., at 12:20 p.m., at 2:30 p.m., and at 5:00 p.m. (Defs' Resp. to Pl's St. of Mat. Fct. ¶¶ 57-60.)

Marshall understood a "psych hold" to indicate that the inmate is either suicidal or has a mental illness. Marshall was trained to recognize symptoms of mental illness, including delusional thoughts, hallucinations, violent behavior, and attempts at self-harm.

Around 12:30 a.m., on May 17, 2020, Defendant Marshall noticed swelling in Plaintiff's wrist.[15]  Because of swelling in Plaintiff's wrist, Defendant Marshall called Defendant Bausman, her commanding officer, and reported the swollen wrist.[16]  Defendant Bausman instructed Defendant Marshall to wait for medical to examine Plaintiff's wrist the next morning. Marshall did not call the nurse, although she was trained to call Bausman and the nurse if there was a physical health concern for an inmate and had done so before. Ultimately, it was determined that Plaintiff's wrist was not broken.

During her shift, Defendant Marshall checked on Plaintiff "a lot," estimating that she checked on him more than once every fifteen minutes, but she did not keep a contemporaneous fifteen-minute observation log to memorialize those actions or the times they took place.

Generally, Marshall was trained to call Pathways as the on-call mental health provider if an inmate attempted self-harm or if mental illness was suspected.

Defendant Marshall observed no physical injuries to Plaintiff other than a swollen left wrist before leaving her shift at 6:00 a.m. on May 17, 2020. At no time did Defendant Marshall believe Plaintiff was suffering from a life-threatening emergency during her shift.

---

[15] According to Plaintiff, Defendant Marshall noticed that Plaintiff's left wrist was "swollen really bad from hitting the door" and may have been broken.  (Pl's Resp to Defs' St. of Mat. Fct. ¶ 76.)
[16] Plaintiff notes that Defendant Marshall informed Defendant Bausman that Plaintiff's left wrist was badly swollen and possibly broken. (Pl's Resp to Defs' St. of Mat. Fct. ¶ 77.)  Bausman was not present at the Jail at any time during Plaintiff's incarceration.

The May 16, 2020 night shift was relieved at 6:00 a.m. on May 17, 2020, by Cotton and Staten, among others. Marshall communicated what occurred on her shift to the oncoming shift, including that she called Bausman regarding the potential of Plaintiff 's wrist being broken.

After Defendant Cotton arrived, she observed Plaintiff and observed some "puffiness" around his collarbone.  Plaintiff had a blanket around his neck, so Defendant Cotton was unable to completely observe his collarbone.[17]  Cotton did not recall such swelling during her shift on May 16, 2020, or she would have logged it.

Approximately one hour later, at around 7:00 a.m., Nurse Davis examined Plaintiff's pupils for head trauma, which were equal and did not indicate head trauma.  At 9:00 a.m. Nurse Davis noted that Plaintiff remained naked and "combative within the cell" and had left wrist redness and swelling, i.e., edema.[18]  She also noted that correctional officers stated that Plaintiff had not slept and that he was standing naked in his cell yelling, "you ate my kids," while hitting the cell door with both arms. At 10:00 a.m., Plaintiff complained to Nurse Davis of pain in his wrist, stating it was broken.

Because Nurse Davis could not assess the extent of the wrist injury, she contacted her supervisor, Nurse Practitioner Amy Franks, at 11:20 a.m. regarding Plaintiff's wrist. Franks determined that Plaintiff needed to be transported to the hospital for evaluation of his wrist.

Nurse Davis did not provide instructions to any correctional officer regarding Plaintiff 's care on May 17, 2020, prior to 11:20 a.m. when she instructed that he be transported to the emergency room.

---

[17] Plaintiff responds that Defendant Cotton was unable to see Plaintiff's neck because he had a blanket draped over his shoulders which covered his neck. This appears to be a distinction without a difference. (Pl's Resp to Defs' St. of Mat. Fct. ¶ 87.)

[18] The parties dispute the extent of the swelling. (Pl's Resp to Defs' St. of Mat. Fct. ¶ 90.)

While arrangements were being made for Plaintiff's transfer to outside medical, Defendant Cotton observed Plaintiff standing at his cell door around 12:30 p.m.  As Defendant Cotton was observing Plaintiff, Plaintiff removed his blanket, revealing that his neck was swollen. After noting the swelling, Defendant Cotton immediately called medical, and Nurse Davis came and checked Plaintiff's swelling.

Defendant Owen, who had worked the night shift at the Jail beginning at 6:00 p.m. on May 16 observed that Plaintiff's "neck was a lot more swollen" on the afternoon of May 17 than it was when he left his shift at 6:00 a.m.  When called to assist with transport, Staten noticed that Plaintiff's neck and collarbone were obviously swollen.

Although corrections officers could summon emergency medical services without prior authorization, neither Cotton nor Staten did so because Nurse Davis did not believe that Plaintiff was in any distress prior to the decision that was made to transport him.

At 1:15 p.m., Deputy David Owen and Defendant Staten transported Plaintiff to the emergency room of JMCGH.

Although Henderson County Jail policies require response to life-threatening illness/injury to be within three minutes and any transport to an emergency room to be via emergency medical services, Plaintiff was transported to the emergency room by squad car because Nurse Davis did not believe Plaintiff was in any distress, and he was not complaining of shortness of breath. Additionally, Defendant Cotton did not believe Plaintiff's swelling constituted an emergency situation.

Owen met the transporting officers in the emergency room. Owen noted that Plaintiff's neck was so swollen it appeared as if he was wearing a horse collar. Owen did not notice any swelling when he left his shift at 6:00 a.m. on May 17.

15

Ultimately, Plaintiff arrived at JMCGH and was diagnosed with a subcutaneous emphysema. A subcutaneous emphysema is a condition where air escapes the lung and fills up under the skin causing swelling. Nurse Davis did not know what subcutaneous emphysema was at the time of Plaintiff's incarceration.

Medical personnel at JMCGH noted that Plaintiff presented with an altered mental status, a psychiatric problem, and paranoid agitation with a reported onset date of May 15, 2020.[19]   At the time of admission, Plaintiff was confused, hostile and paranoid, and was unaware of his age or his location.   A differential diagnosis was established that included schizophrenia, alcohol intoxication, drug abuse, hallucination, and psychosis; however, a urinalysis drug screen performed in the emergency department was negative for all tested drugs and alcohol with the exception of cannabinoids.[20]

Plaintiff required medical restraints in the emergency department as well as treatment with various medications.   Plaintiff was diagnosed with traumatic subcutaneous emphysema and pneumomediastinum that presented as extensive air under the skin at his ears, neck, chest, abdomen, and upper legs bilaterally. It became medically necessary to take life saving measures and intubate Plaintiff due to airway compromise and shallow labored breathing, and he was transferred via ground ambulance to Vanderbilt University Medical Center ("VUMC") for further treatment.[21]

---

[19]   Defendants add that there is no proof of when the altered mental status arose, what caused the altered mental status, or whether or not the altered mental status was precipitated by drugs. Additionally, according to Defendants, even if Plaintiff was suffering from an altered mental status at the Jail not caused by an intoxicant, there is no expert proof in the record that any delay in care caused a detrimental effect.  (Defs' Resp. to Pl's St. Mat. Fct. ¶ 94.)

[20]   *See id.*

[21] Defendants do not dispute these facts but contend that there is no proof in the record to show when Plaintiff's physical injuries arose or what caused Plaintiff's physical injuries and argue that

Plaintiff was released on recognizance from the custody of the Henderson County Jail at 4:18 p.m. rendering him responsible for the cost of all medical care.

While at VUMC, Plaintiff was treated for acute respiratory failure with hypoxia, a "traumatic" pneumothorax, and subcutaneous air.  VUMC medical personnel described the mechanism of injury as self-inflicted blunt force trauma.[22]

At VUMC, Plaintiff was also diagnosed with bipolar disorder, including a then current manic severe episode with psychotic features and his mental health symptoms continued during his admission. Plaintiff remained highly agitated during his eleven-day admission at VUMC, and he required medical restraints while admitted there. Plaintiff was treated with various medications including Depakote, Seroquel (antipsychotic) and Haldol (antipsychotic) along with sedatives.[23]

Plaintiff was also treated at VUMC for acute respiratory failure with hypoxia, a "traumatic" pneumothorax, and subcutaneous air.

Plaintiff received mental health assessment treatment at JMCGH and VUMC while being treated for his physical injuries, and at Middle Tennessee Mental Health, Pathways, and Crestwyn after release from VUMC.

---

there is no expert proof in the record showing any detrimental effect for a delay of treatment for Plaintiff's physical injuries. (Defs' Resp. to Pl's St. Mat. Fct. ¶¶ 98-99.)

[22] Defendants again do not dispute these facts but contend that there is no proof in the record to show when Plaintiff's physical injuries arose or what caused Plaintiff's physical injuries and argue that there is no expert proof in the record showing any detrimental effect for a delay of treatment for Plaintiff's physical injuries. (Defs' Resp. to Pl's St. Mat. Fct. ¶¶ 102-03.) Defendants also contend that the blunt force trauma could have occurred prior to arriving at the Jail, such as when Plaintiff was taken to the ground by LPD officers, but, due to the nature of the injuries, they did not physically manifest themselves until May 17.

[23]  Defendants do not dispute these statements but note that Plaintiff was also diagnosed with cannabis use disorder and that there is no proof in the record of when Plaintiff's mental health conditions arose, what caused those conditions, or whether the conditions were precipitated by drug use. They also state that there is no expert proof in that record to show that a delay in care for Plaintiff's mental health conditions caused any detrimental effect. (Defs' Resp. to Pl's St. Mat. Fct. ¶¶ 104-06.)

At no point during Plaintiff's incarceration were the Henderson County Defendants able to distinguish between whether Plaintiff was intoxicated or high or whether he was suffering from a mental episode.

At all times relevant, Henderson County contracted with Southern Health Partners ("SHP") to provide healthcare services to the inmates/detainees at the Jail. Pathways was the designated mental health provider. Pathways will not accept intoxicated inmates for a period of at least twenty-four hours.

Correctional officers at the Henderson County Jail were trained to call Pathways if an inmate was brought in on a "psych hold"; if they engaged in self-harm or expressed suicidal thoughts; or if an inmate was placed in Cell 257A out of concern for their mental health.

Correctional officers are not medical professionals.

Although there were no mental health professionals onsite at the Henderson County Jail, Pathways was known to be the Jail's on-call provider and accessible by calling a hotline crisis phone number. While correctional officers may call Pathways without prior authorization, neither Owen nor Simpson did so. Defendants Owen and Simpson testified in their depositions that they believed Plaintiff was intoxicated, as reported by an LPD officer.

Neither Owen nor Simpson received or relied on any advice from any medical professional in addressing Plaintiff's alleged mental health needs.

All Jail officers are required to be certified by the Tennessee Correction Institute ("TCI") and undergo forty hours of TCI basic training within one year of being hired. Additionally, all newly hired correctional officers underwent on-the-job training under the guidance of a more experienced officer, and as required by TCI, the Jail required all its jail officers to undergo at least forty hours of TCI in-service training every year. The training provided by the Jail was annually

approved by TCI.  The Jail training includes training on medical services, providing emergency medical care when necessary, providing access to medical and mental health care, recognizing mental health issues, properly monitoring individuals with mental health issues, use of the restraint chair, and self-harm prevention.

All inmates are provided timely access to on-site medical services.

Jail officers are trained yearly on access to medical care and the Jail's health care procedures.  For non-emergency medical issues, Jail officers are trained to instruct inmates to fill out a sick call request, explaining their complaint.

Henderson County Corrections Policy 2.06 provides officers direction on "how to respond to a health care emergency" and establishes training standards to assist staff in responding to health care emergencies.  According to the Policy, "a health care emergency will mean but not limited to, discovery of a person who is unconscious or unresponsive, without pulse, not breathing or having difficulty [] breathing choking, bleeding profusely . . . or suffering a life threatening injury or illness."  The Policy further requires at least one officer to be first-aid trained and CPR certified during each shift.  The Jail provides yearly training on first-aid, CPR, and the recognition of signs and symptoms of potential emergency situations.

Although the Jail strives, based on its training, to respond to any medical or mental health emergency within three minutes to ensure a prompt response time, Plaintiff contends that neither his mental health nor physical health issues were responded to within three minutes.

Based on the severity of the emergency, officers are trained to either call the on-duty nurse or directly call emergency medical services if the emergency appears to be life-threatening. Officers on night shift are trained to call Defendant Bausman and report any non-emergency medical concerns they may have for an inmate.

Officers at the Jail are trained yearly on recognizing the signs and symptoms of mental illness and acute chemical intoxication and withdrawal, and on self-harm intervention. During training, officers are further instructed that Pathways is the on-call mental health provider.  When an inmate is suicidal or has attempted self-harm, officers are directed to call Pathways.

When the booking officers begin their shifts, they are trained to review all logs from the prior shift and perform a cell-check of the inmate exhibiting mental health or acute chemical intoxication. Officers are trained to house any potentially mentally ill and/or intoxicated inmates in the booking area.

Pursuant to Henderson County Corrections Policy 3.10 restraint devices, such as restraint chairs are only to be used as a control measure when necessary due to the demonstrated behavior of the detainee or the need to prevent self-harm, among other reasons. Pursuant to Jail policy, when a detainee is placed in a restraint chair, the employee's supervisor and medical must be notified. Furthermore, "[d]ocumentation will be started every time an inmate is placed in the restraint chair recording the time the device is initially used, ending time (removal of the offender) the reason for the use and the signature of the authorizing supervisor." Officers log observations in fifteen-minute increments while the detainee remains in the restraint chair. Officers are trained to discuss the use of a restraint chair and the reason for its use with the oncoming shift when their shift ends.

Pursuant to Henderson County Corrections Policy 2.37, use of force forms must be generated for any officer use of force. Additionally, officers also document other incidents in a written report in a number of other instances involving inmate health and safety.

Any use of form report or other incident report is forwarded to the Chief Corrections Officer and Jail Administrator. If the Chief Corrections Officer or Jail Administrator determines that the use of force or other incident requires investigation for any potential policy violation, an

investigation will be conducted.  All observation logs in booking are reviewed by the booking officer of the incoming shift. Should the booking officer have concerns about the recorded observations, the booking officer is trained to communicate their concerns to their commanding officer, who will take the concerns up the chain of command.

Henderson County Corrections Policy 4.10 governs the Jail's response to arrestees brought in on "psych holds."[24]  When applicable, the policy dictates, in part, that "the booking officer completes the booking process and notifies Pathways advising that they have brought him for an evaluation."

The Jail's officer training meets national standards.  The Jail's officer training meets TCI standards.

<u>Analysis</u>

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983.  In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating

---

[24] Defendants state that this policy applies to arrestees brought to the Jail on a psych hold instead of and without any criminal charges.  Plaintiff counters that individuals under "Emergency Involuntary Admission to Inpatient Treatment" who do not have pending criminal charges cannot be detained in a jail pending examination because, to do so would violate Tenn. Code Ann. § 33-6-425 which provides "No defendant shall be detained at a jail or other custodial facility for the detention of persons charged with or convicted of criminal offenses, unless the defendant is under arrest for the commission of a crime."  (Pl's Resp. to Defs' St. Mat. Fct. ¶ 144.)  The parties also disagree as to the definition of "psych hold."  (*Id.* at ¶¶ 145-46.)

federal rights elsewhere conferred." *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001). Here, Plaintiff alleges that Defendants violated his constitutional right to adequate medical care.

In their motion for summary judgment, Defendants assert that (1) Defendant Henderson County cannot be held liable under *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658 (1978), and (2) Defendants Officers are entitled to qualified immunity.

Municipality Liability

Generally, local governments such as Defendant Henderson County are not considered to be "persons" under § 1983 and, thus, are not subject to suit. *Monell*, 436 U.S. at 691. However, when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [complained of] injury [,]" municipalities and other local governments are considered a "person" for purposes of § 1983. *Id.* at 694; *see also Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*). "Under § 1983, local governments are responsible only for their own illegal acts" and may not be held vicariously liable for the actions of their employees. *D' Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011). That is, § 1983 liability does not attach to a municipality based on the actions of its employee tortfeasors under the doctrine of respondeat superior; instead, such liability may only be imposed on the basis of the municipality's own custom or policy. *Monell*, 436 U.S. at 691.

Thus, plaintiffs who seek to impose liability on local governments under § 1983 must prove that an action pursuant to an official policy or custom caused their injury. *Id.* "[T]he official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body," *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at

694), and that body may be held liable only for constitutional violations resulting from its official policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n. 6 (1986) (citations omitted). Official municipal policy includes the decisions of a government's lawmakers or the acts of its policymaking officials. *Id.* at 480 – 481 (1986). A municipality's "policies" are "decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality," *Bryan Cnty.*, 520 U.S. at 403-04, while a "custom" is a practice that, while not formally approved, "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404. A custom can be one of action or inaction and need not be formally approved by the entity. *City of Canton v. Harris*, 489 U.S. 378, 404 (1989).

Absent proof it resulted from an unconstitutional policy or custom, a county is not liable for a single incident resulting in a constitutional violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985). Furthermore, a county is not liable unless there is an "affirmative link between the policy and the particular constitutional violation alleged" or "causal connection." *Id.* Thus, a plaintiff must "identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

Plaintiff asserts claims against Defendant Henderson County under the following theories: (1) Defendant failed to investigate its officers' actions during Plaintiff's incarceration and failed to punish the officers for violating Plaintiff's rights; (2) Defendant failed to appropriately train its officers, and (3) Defendant ratified the alleged unconstitutional conduct of its employees. (Cmplt. ECF No. 1 ¶¶ 59-61.) Defendant County has moved for summary judgment on all these theories.

Looking first at Plaintiff's failure to investigate and discipline claim, the Court agrees with Defendant that Plaintiff has not shown that the alleged failure to investigate was the "moving force" behind any constitutional deprivation to Plaintiff because Plaintiff has pointed to no evidence in the record of other instances of previous failures to investigate and/or discipline. As explained in *Hysell v. Thorp*, 2009 WL 262426, at *23 (S.D. Ohio Feb. 2, 2009):

> [I]t cannot be said that the failure to conduct a meaningful investigation into Plaintiff's complaint was the cause of his constitutional injury. Once an individual's rights have been violated, a subsequent failure to conduct a meaningful investigation cannot logically be the "moving force" behind the alleged constitutional deprivation. *See Tompkins* [*v. Frost*], 655 F. Supp. [468, 472 (E.D. Mich. 1987)] ("[w]rongful conduct after an injury cannot be the proximate cause of the same injury"); *Fox v. VanOosterum*, 987 F. Supp. 597, 604 (W.D. Mich. 1997) (argument that decision not to investigate, made after alleged violation took place, somehow caused that violation, defies logic). For these reasons, the Court finds in favor of Sheriff Thorp on Plaintiff's claim concerning the alleged failure to investigate his complaint.
>
> Plaintiff also maintains that the constitutional violations in this case were caused, in part, by the Licking County Sheriff's Office's acquiescence in previous uses of excessive force by Sergeant Carson and its failure to discipline Sergeant Carson for that misconduct. A governmental entity may be held liable under § 1983 for constitutional deprivations resulting from a failure to discipline employees who violate the constitutional rights of citizens. However, in order to establish the requisite "deliberate indifference," a plaintiff must generally show a "history of widespread abuse that has been ignored." *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir.1994). Plaintiff must show that the Sheriff knew of prior unconstitutional conduct on the part of his employees and failed to take corrective measures. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir.1997).

*Hysell*, 2009 WL 262426, at *23. In this case, Plaintiff has failed to make such a showing. There is nothing in the record showing a "history of widespread abuse that has been ignored."

Moreover, Plaintiff's claim is that Defendants were deliberately indifferent to his serious medical needs. His failure to investigate/discipline claim involves "conduct that was unrelated to any claim by Plaintiff that he needed medical care." *Seastrom v. Jennett*, 2019 WL 5157137, at *6

24

(W.D. Mich. Oct. 15, 2019).  Accordingly, Defendant County is entitled to summary judgment on this claim.

Next, Plaintiff claims that Defendant County failed to properly train its employees on emergency involuntary commitment procedures. Clearly Plaintiff was entitled to receive medical care, and there are disputed issues of fact in the record as to whether he received the requisite medical care as discussed below. However, to defeat summary judgment, Plaintiff must also show that there are disputed issues of fact showing that Defendant County failed to train its officers in the provision of necessary medical care for detainees.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61.  To succeed on a failure to train or supervise claim, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

As evidence of Defendant County's alleged failure to train, Plaintiff points to the deposition testimony of Defendant Bausman that she was not aware of any specific guidelines as to when to call Pathways for an evaluation of a detainee exhibiting signs of a mental illness and was not aware that there should be an "immediate examination" of individuals subject to emergency involuntary commitment.  However, Plaintiff has provided no expert testimony as to any gaps in the training provided by Defendant County or the inadequacy of its training program, while Defendant has provided undisputed evidence that its training on recognizing mental health issues, properly monitoring individuals with mental health issues, use of the restraint chair,

25

prevention of self-harm, and access to medical care met TCI standards.[25]   Defendant's expert, John G. Peters, opined that the training provided by Henderson County was in accordance with national and TCI standards.

Although the Court agrees with Plaintiff that the mere fact that an officer receives some training or initial training does not necessitate a finding that the training was adequate as a matter of law, s*ee Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992)(granting of summary judgment reversed when, although the city provided some nominal training, the plaintiff had created an issue of fact regarding the adequacy of the training given); *Lee v. Metropolitan Government of Nashville*, 596 F.Supp.2d 1101, 1126-1127 (M.D. Tenn. 2009)(although officers received a basic instructional course on Taser use, summary judgment was denied because the lack of specific training on how to take advantage of the "window of opportunity" raised an issue of fact as to whether that training was adequate), in this case, Plaintiff has not presented evidence sufficient to create an issue of fact as to the adequacy of the training.

Moreover, even if Plaintiff had pointed to disputed facts concerning the adequacy of the training provided by Defendant County, he has not shown that there are facts from which the jury could find that the inadequacy was the result of Defendant's deliberate indifference.  As explained in *Connick*,

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous [when] a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S. Ct. 2427, 85 L. Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the

---

[25] The Sixth Circuit permits the use of expert testimony in establishing failure to train claims. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures.").

> constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton* [*v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197 (1989)]. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S. Ct. 1197.

*Connick*, 563 U.S. at 61.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410. Thus, when municipal policymakers are on actual or constructive notice that a particular omission in their training program causes its employees to violate citizens' constitutional rights, the municipality (in this case Henderson County) may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.* at 407. The entity's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." *Id.* at 392; *see also Pembaur,* 475 U.S. at 483 ("[M]unicipal liability under § 1983 attaches [when] - and only [when] - a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").

For a finding of deliberate indifference, a plaintiff ordinarily must "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (citation omitted). "Alternatively, [a] plaintiff[ ] could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the [entity] had failed to train its employees to handle

recurring situations presenting an obvious potential for such a violation." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012) (citing *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (requiring a "showing that the [c]ity had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation" under a single-violation theory).

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390.

Here, there is no evidence in the record showing "prior instances of unconstitutional conduct demonstrating that [Defendant County] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." However, the "recurring situation" theory of liability does not require Plaintiff to show that Defendant had actual or constructive notice that its officers were deficiently trained. *See Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 739 (6th Cir. 2015) (citing *Connick*). Instead, to survive summary judgment, Plaintiff must point to evidence in the record showing that Defendant County failed to train Defendant Officers "to handle recurring situations presenting an obvious potential for such a violation." *Bryan Cnty.*, 520 U.S. at 409. Plaintiff must set forth facts to indicate that there was a "likelihood that the situation would recur" and that it was predictable "that an officer lacking specific tools to handle that situation would violate citizens' rights." *Id.*

The Court finds that Plaintiff has failed to point to such evidence in the record. There is nothing in the record from which the jury could find that the "need for more or different training

[was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, [that] the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.  That is, there are no facts from which a jury could find that proper training would have prevented Plaintiff's alleged injuries and that the County "could reasonably foresee that [its] employee's wrongful act would follow from the lack of training." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 409 (6th Cir. 2022) (citation omitted). The issue in this case is not that the County did not train its officers in dealing with detainees who exhibited signs of mental distress. Instead, the issue, as discussed below, is whether the officers acted in accordance with their training.[26]

Finally, Plaintiff claims that Defendant County ratified the alleged unconstitutional conduct of its officers.  The ratification theory of liability does not require proof of a pattern or custom. *See*, *e.g.*, *Wilson v. Louisville-Jefferson Cty. Metro Gov't & Brett Hankison*, 2020 WL 981717, at *2, (W.D. Ky. Feb. 26, 2020). Instead, ratification of a single violative act is enough for municipal liability to attach. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). An official acting with final decision-making authority may ratify the unconstitutional acts of its employees if he or she gives "affirmative approval of a particular decision made by a subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993).

Plaintiff contends that Defendant Bausman's job duties elevate her to the level of being Defendant County's "policy maker," thus allowing her to endorse and/or ratify the actions and

---

[26] Plaintiff himself points this out in his response to the motion for summary judgment, *e.g.*, "Marshall did not call the nurse, although she was trained to call Bausman and the nurse if there was a physical health concern for an inmate, and had done so before. Similarly, Marshall was trained to call Pathways as the on-call mental health provider if an inmate attempted self-harm or if mental illness was suspected. She was trained to look for symptoms of mental illness such as delusional thoughts, hallucinations, violent behavior, and attempts as self-harm." (Resp. p. 10, ECF no. 57-29 (record citations omitted).)

inactions of the defendant officers.  In support of his contention, Plaintiff points to Bausman's deposition testimony that she did not believe that the officers did anything wrong in their handling of Plaintiff's situation and his medical needs and that her role as it relates to the policies and procedures of the Jail is to "oversee the correctional officers . . . [and] the day-to day running of the facility."

Plaintiff's ratification claim fails because Defendant Bausman was not Defendant County's policy maker. As noted by Defendant, in Tennessee the county sheriff is the policymaker with respect to law enforcement. *See Wooten v. Logan,* 92 F. App'x 143, 148 (6th Cir. 2004) (citing *Spurlock v. Sumner Cty*., 42 S.W.3d 75, 77, 82 (Tenn. 2001)).) ("It is equally well settled that in Tennessee, the county sheriff is a municipal policymaker with respect to law enforcement."); *accord Spainhoward v. White Cnty., Tennessee,* 421 F. Supp. 3d 524, 547 (M.D. Tenn. 2019); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 786 (W.D. Tenn. 2015).  Here, it is undisputed that Defendant Bausman is not the sheriff of Henderson County. Consequently, she is also not its policy maker.

In summary, Defendant County is granted summary judgment on Plaintiff's claims brought against it.

<u>Individual Liability</u>

Defendant Officers are sued as individuals. Plaintiff claims that the officer defendants failed to provide Plaintiff with prompt medical care in violation of his civil rights.  Defendants have responded that they are immune from suit under the doctrine of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

conduct." *Wood v. Moss*, 572 U.S. 744, 757 (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)) (internal quotation marks omitted). A right is clearly established if "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). Practically speaking, "a body of relevant case law is usually necessary to clearly establish the answer." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018). Once qualified immunity is raised, the plaintiff bears the burden to prove that the defendant is not entitled to it. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Thus, to determine whether qualified immunity is warranted, a court must first ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).[27]

Here, Plaintiff identifies the contours of his claim as the defendant officers' violating his right to medical care, specifically in being deliberately indifferent to his serious mental health and physical needs and failing to provide prompt medical care. The Eighth Amendment prohibits cruel and unusual punishments. This protection "includes a right to be free from deliberate indifference to an inmate's serious medical needs." *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 591 (6th Cir. 2021) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)). However, the Eighth

---

[27] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Court "reconsider[ed] the procedure required in *Saucier* [and concluded] that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

Amendment does not apply to pretrial detainees like Plaintiff. *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004). Instead, pretrial detainees have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment. *Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 566 (6th Cir. 2020). *See generally Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005); *Britt v. Hamilton Cnty.*, 531 F. Supp. 3d 1309, 1322 (S.D. Ohio 2021), *aff'd*, 2022 WL 405847 (6th Cir. Feb. 10, 2022) (stating that it is well-settled that pretrial detainees have a right under the Fourteenth Amendment to adequate medical treatment.)

Until recently, courts "analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Brawner*, 14 F.4th at 591 (citation omitted). The Eighth-Amendment framework for deliberate indifference claims has an objective and a subjective component. *Griffith*, 975 F.3d at 567. "The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the [Constitution]," while the subjective component requires a plaintiff to show that "each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id.* at 567-68 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)).

Relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015),[28] the Sixth Circuit Court of Appeals in *Brawner* concluded that *Kingsley* required

---

[28] In *Kingsley*, the Supreme Court compared the standard for excessive force claims brought by pretrial detainees under the Due Process Clause of the Fourteenth Amendment to excessive force claims brought by convicted prisoners under the Eighth Amendment. 576 U.S. at 400. The Court was asked to determine "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were subjectively aware that their use of force was unreasonable, or only that the officers' use of that force was objectively unreasonable." *Id.* at 391–92. The Court answered that the proper standard was objective based on the differences between the Due

"modification of the subjective prong of the deliberate-indifference test for pretrial detainees." *Id.*
at 596 ("Given *Kingsley's* clear delineation between claims brought by convicted prisoners under
the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment,
applying the same analysis to these constitutionally distinct groups is no longer tenable.")  The
*Brawner* Court modified the second prong of the deliberate indifference test applied to pretrial
detainees to require only recklessness: "A pretrial detainee must prove 'more than negligence but
less than subjective intent — something akin to reckless disregard.'"  *Id.* at 597 (quoting *Castro v.
Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). Thus, a plaintiff must prove
that the defendant acted "deliberately (not accidentally), [and] also recklessly in the face of an
unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.*
(citation and quotation marks omitted).

At the time of the incident, the Sixth Circuit applied the pre-*Kingsley* analysis standard to
a pre-trial inmate's claims that officers failed to provide him with medical care.[29]  However, the
Sixth Circuit clarified the standard to be used in *Hopper v. Plummer*, 887 F.3d 744 (6th Cir. 2018),
where defendants facing excessive force claims based on pre-*Kingsley* conduct argued for
qualified immunity because it would not have been clear to them that claims against them would
be governed by an objective standard. "[W]e have rejected this argument before because 'a
defendant is not entitled to qualified immunity simply because the courts have not agreed upon the

---

Process Clause and the Cruel and Unusual Punishments Clause. *Id.* at 400 ("The language of the
two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial
detainees (unlike convicted prisoners) cannot be punished at all[.]"). However, the Court did not
"address whether an objective standard applies in other Fourteenth Amendment pretrial-
detainment contexts[,]" such as deliberate indifference. *Brawner*, 14 F.4th at 592.  The Sixth
Circuit answered that question in *Brawner*.
[29] *Kingsley* was decided in 2015; the incident occurred in 2020; and *Brawner* was decided in
2021.

precise formulation of the [applicable] standard.'" *Id.* at 755-56 (citations omitted). "Rather, the relevant question under the clearly established prong is whether defendants had notice 'that [their] conduct was unlawful in the situation [they] confronted.'" *Id.* at 756 (quoting *Saucier*, 533 U.S. at 202).

Therefore, this Court must determine whether the individual officers were deliberately indifferent to Plaintiff's serious medical needs using the guidance provided by *Brawner* and its progeny as set forth in *Trozzi v. Lake Cnty., Ohio*, 29 F.4th 745 (6th Cir. 2022).

> [A] plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk. This third inquiry faithfully applies *Kingsley*, 576 U.S. at 396, 135 S. Ct. 2466 (recognizing that liability for a constitutional tort, even one that includes an objective inquiry, must still be "purposeful or knowing" and that criminal "recklessness" might suffice, ensuring that there is a sufficiently culpable mental state to satisfy the "high bar" for constitutional torts grounded in a substantive due process violation. In practice, that may mean that a prison official who lacks an awareness of the risks of her inaction (because, for example, another official takes responsibility for medical care, a medical professional reasonably advised the official to not act, the official lacked authority to act, etc.) cannot have violated the detainee's constitutional rights.

*Trozzi*, 29 F.4th at 757-58 (citations omitted). "Put another way," on summary judgment, the Court must determine whether the plaintiff "has presented sufficient evidence for a reasonable jury to conclude that: (1) a reasonable officer (knowing what the particular jail official knew at the time of the incident) would have known [the detainee] was suffering from a serious medical need that posed an excessive risk to [his or] her health; and (2) [the officers] knew that non-intervention would create an unjustifiably high risk of harm to [the detainee's] health and ignored that risk."

*Id.* at 758.[30] The Court finds that Plaintiff has presented sufficient evidence to meet the *Trozzi*

standard and defeat summary judgment.

The Court must first determine if there are disputed issues of facts from which a jury could

find that Plaintiff had serious medical needs while he was in the Jail. A serious medical need is

one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*,

539 F.3d 510, 518 (6th Cir. 2008). *See also Phillips v. Roane Cnty.*, 534 F.3d 531, 540 (6th Cir.

2008) (finding that a medical need is objectively serious if it is "one that is so obvious that even a

lay person would easily recognize the necessity for a doctor's attention.")

> Whether a medical need is "obvious" does not depend on whether it was in fact
> obvious to anyone *at the time*; that issue goes to the subjective, rather than the
> objective, component of deliberate indifference. Rather, the question is whether the
> average person would easily recognize - whether from observing the person or
> being told of his symptoms - that the plaintiff's condition needed treatment
> .. . .
> [O]bviousness in the sense of visibility - speaks more directly to subjective
> awareness than to objective seriousness. It also makes sense because a condition
> that appears serious to a layperson observing it may in fact be harmless, and a
> condition that appears harmless may in fact be serious. Therefore, we will gauge
> seriousness based on how the layperson would likely react to the relevant facts, not
> on his ability to discover those facts.

*Gunther v. Castineta*, 561 Fed. App'x 497, 499-500 (6th Cir. 2014) (emphasis in original).

Plaintiff has presented two "serious medical needs" in his lawsuit – serious physical needs

and serious mental health needs. As noted by Defendants, Plaintiff does not dispute in his response

that his alleged physical conditions, in and of themselves, were nonobvious to a lay person.

Therefore, Plaintiff has failed to prove the objective component of his § 1983 claim related to his

physical injuries, and Defendant Officers are entitled to summary judgment on this claim.

---

[30] The Court is mindful that it must evaluate each officer individually, *see Trozzi*, 29 F.4th at 58.

As for the claim related to his mental health needs, the Court finds that the jury could find that these needs would have been obvious to a lay person. A pretrial detainee's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Danese v. Asman*, 875 F.2d 1239, 1243-44 (6th Cir. 1989); *see also Gunther*, 561 Fed. App'x at 499-500 (finding paranoia and schizophrenia to be obvious serious medical needs); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006) (stating that the deprivation of psychological services can be a sufficiently serious medical need).

In this case, a jury could find that the following evidence would lead a lay person to conclude that Plaintiff had serious medical needs related to his mental health issues. Plaintiff's parents had called LPD because of concerns about his "bizarre" behavior. They had arranged for a mental health evaluation the next day because of their concerns. However, Plaintiff's behavior had escalated, and they called LPD.[31]

When Plaintiff arrived at the Jail, he ran headlong into the closed sally port door and had to be placed in the restraint chair for four hours and forty-seven minutes. While in the restraint chair, he continued to attempt to harm himself. Throughout the night shift on May 15, 2020, Plaintiff could not answer basic questions such as the date, name of the current president, his own name, or his Social Security number. There is also evidence in the record that, on the morning of May 16, Plaintiff took a running start and ran into the steel cell door multiple times and that this behavior caused him to be placed in the restraint chair again, this time for five hours and twenty minutes. During this time, he expressed delusional thoughts and hallucinations.

---

[31] The Court finds the testimony of Plaintiff's parents to be relevant only as to the objective prong, that is, would Plaintiff's mental health needs have been obvious to a lay person. His behavior prior to his incarceration is relevant to that inquiry. However, because it is undisputed that Defendant Officers did not know about the events preceding Plaintiff's arrest, the Court has not considered this evidence in its analysis of the subjective prong.

There is also evidence in the record that, during the night shift of May 16, 2020, and after being released from the restraint chair a second time, Plaintiff continued to hit the door with his fist and head and cried, yelled, and spoke non-sensibly off and on throughout the night shift. The force with which he hit the door was such that it caused Defendant Marshall to believe that he had suffered a fracture based on the obvious swelling of his hand and wrist.

Plaintiff acknowledges that Defendant Officers could not diagnose his mental illness but correctly notes that is not the inquiry; rather, "seriousness" is gauged by how a lay person would view the symptoms shown in the record such as persistent delusions, hallucinations, confusion, combativeness, and repeatedly engaging in self-harm by hitting immovable metal objects with his head, neck, and body - and whether those symptoms would indicate Plaintiff needed a mental health evaluation.[32] Thus, the Court finds that a reasonable juror could conclude that Plaintiff's serious mental health needs would have been obvious to a lay person based on the symptoms Plaintiff presented.[33]

Next, the Court must determine if there are disputed issues of fact, viewed in the light most favorable to the Plaintiff, from which a jury could find that the individual county officers should have known of Plaintiff's serious medical needs and that they posed an excessive risk to his health.

As pointed out by Plaintiff, a defendant's knowledge may be established by circumstantial evidence, including contemporaneous notations to logs and conversations among jail staff.

---

[32] Defendants attempt to rely on their assertions that they themselves did not recognize that Plaintiff needed a mental health evaluation as evidence that a lay person would have also not have recognized such a need. Again, this argument is better made as to the subjective prong of the test.

[33] Defendants argue that Plaintiff's behavior could have been the result of intoxication. However, the jury could find that, even if Defendants initially attributed Plaintiff's behavior to intoxication, at some point during his stay, they should have known that the effects of intoxication would have worn off and yet he was still exhibiting abnormal behavior.

*Bonner-Turner v. City of Ecorse*, 627 Fed. App'x. 400, 407 (6th Cir. 2015) (citing *Comstock v. McCrary*, 273, F.3d 693, 703 (6th Cir. 2001) (internal citation omitted)). "Although failure to follow administrative policies does not itself constitute deliberate indifference, evidence of such a violation may be considered as evidence of an officer's knowledge." *Id.*

Before considering each officer individually, the Court notes that all of the defendant officers testified that Plaintiff was under a "psych hold" and each had a least some understanding that the designation implied mental illness and/or a threat of self-harm.[34] The jury could find that the officers knew or should have known that an inmate under a psych hold required prompt evaluation and treatment.  The jury could find that Plaintiff's erratic behavior upon entering the Jail would have put a reasonable officer on notice that he had mental health issues and/or was intoxicated to the extent that either or both posed an excessive risk to his health.  Furthermore, there is evidence in the record, as discussed below, that each Defendant either personally witnessed or was advised of symptoms that the officer knew were attributable to mental illness, including repeated self-harm. The Court will now look at the actions of each individual defendant.

Defendant Austin Owen was on duty on May 15, 2020, when Plaintiff was brought to the Jail. The jury could find, pursuant to the Jail Incident Report (ECF No. 57-25), that Owen was advised that Plaintiff was combative and to "get the restraint chair ready."  He witnessed Plaintiff run into the closed metal sally port door.  He participated in placing Plaintiff in the restraint chair and, along with Simpson, monitored him. He maintained a log with Simpson that noted that

---

[34] Defendants argue that the "psych hold" designation is not relevant to the issue of whether Plaintiff's mental health condition was obvious because Plaintiff was brought in under a psych hold (and other charges) based on a "substantial likelihood of serious harm" and potential intoxication and not because immediate mental health treatment was warranted. That designation alone does not mandate a finding that Defendants should have known of Plaintiff's serious medical need. Instead, the designation is only part of the evidence considered by the Court in reaching its decision.

Plaintiff was trying "to hurt himself with the foot restraints." He was made aware that the arresting officer placed Plaintiff on a "psych hold," which meant to Owen that he was "brought in for mental health pretty much to keep them from harming themselves on the streets...." (Simpson Depo. p. 34, ECF No. 57-10; Owen Depo. p. 19, ECF No. 57-5.)

The jury could also find that Defendant Owen knew that the on-call mental health provider was Pathways and that self-harm by an inmate or suicidal thoughts should prompt an officer to reach out to them. (Owen Depo. pp. 56-57.) He was also trained that, when dealing with a combative inmate, he should try to de-escalate the situation and, if that was unsuccessful, he should place the inmate in the restraint chair and call Pathways after they are contained. (Owen Depo. p. 67.) Owen was also aware that symptoms of mental illness and intoxication can overlap and that the proper protocol was to call Pathways so they could decipher the cause of the symptoms and what treatment was needed. (Owen Depo. p. 70.) He knew that any correctional officer could call Pathways without prior authorization of a nurse. (Owen Depo. p. 73.) Owen did not speak to a nurse during his shift and, therefore, received no medically-related instructions upon which he relied regarding Plaintiff. (Owen Depo. p 53.). A reasonable juror could find that despite the knowledge of these protocols and training, Owen did not call Pathways during his shift on May 15, 2020.

As to Defendant Gary Simpson, Simpson was Plaintiff's booking officer at the Henderson County Jail when he arrived on May 15, 2020. There is evidence in the record that he saw Plaintiff run with his full body into the closed sally port door. The arresting officer told Simpson that Plaintiff was placed under a "psych hold," which indicated to Simpson the possibility of mental illness and that Plaintiff was brought into the Jail to "basically house him until properly diagnosed." (Simpson Depo., pp. 20, 33.)

Simpson assisted in placing Plaintiff in the restraint chair where he remained for four hours and forty-seven minutes and logged observations in which he noted that Plaintiff was trying "to hurt himself with the foot restraints" of the chair. (Simpson Depo., p. 30; Restraint Chair Log, ECF No. 57-22.) Simpson was trained to call Pathways in the event a detainee was engaging in violent, combative or self-harming behavior, but failed to. (Bausman 30(b)(6) Depo., pp. 23-24, ECF No. 57-12; Simpson Depo., 27.) In booking Plaintiff, Simpson attempted to ask him general and medical questions to complete booking forms, but Plaintiff could not answer his questions or meaningfully interact. Throughout the shift, Plaintiff could similarly not answer basic questions such as his name, Social Security number, or the current date or the name of the president. (Simpson Depo., pp. 37-39.)

When Plaintiff was released from the restraint chair, Simpson determined he should be placed in Cell 257A due to concerns for his mental health.[35] (Simpson Depo., pp. 44, 47.) That cell does not have a sink, commode, or bunk so as to lessen the potential for self-harm of mentally ill inmates occupying it. (Simpson Depo., pp. 42-44.) When he placed an inmate in 257A for mental health concerns, Simpson was trained to call Pathways for a mental health evaluation, but he did not do so. (Simpson Depo., p. 47.) Although he called the on-call nurse to advise that Plaintiff had been placed in the chair and had a torn toenail, he did not discuss his mental health issues with her, nor did he contact any medical personnel further. (Simpson Depo., pp. 28-29; Jail Incident Report, ECF No. 57-25.)

Defendant Kristi Cotton was the shift commander for the May 16, 2020 day shift at the Jail and worked from 6:00 a.m. until 6:00 p.m. Part of her job responsibilities were to ensure the safety

---

[35] Defendants point out that inmates can be housed in this cell for reasons other than mental illness, and they contend that Defendant Simpson's belief that Plaintiff was high on an unknown intoxicant played a role in his decision to put Plaintiff in this cell.

of inmates and protect them from self-harm. (Cotton Depo., pp. 9-10, ECF No. 57-4.) There is evidence in the record that she received notice from Simpson that Plaintiff was brought into custody under a psych hold; that he had been placed in the restraint chair on the prior shift; and that a Jail Incident Report had been completed. (Simpson Depo., p. 48.) Cotton understood a "psych hold" denoted "someone that was trying to harm themselves," and that they are held under that designation for their own protection. (Cotton Depo., pp. 13, 85.)

On the morning of May 16, 2020, Cotton received a call requesting assistance with placing Plaintiff in the restraint chair. (Cotton Depo., pp. 52-53.) Upon arriving at booking, she observed Plaintiff running into the door, leading with his head and shoulders, more than fifteen times. (Cotton Depo., pp. 53-54.) There is evidence in the record that she believed this self-harming and violent behavior made Plaintiff a threat to himself and others, and, thus, the decision was made to place him in the restraint chair again. (Cotton Depo., p. 55.) The jury could find that Defendant Cotton was trained that attempts at self-harm and combativeness were signs of mental illness, which warranted a call to Pathways. (Cotton Depo., pp. 28-29.)  Once he was restrained, it was noted that Plaintiff had urinated and defecated on himself. (Cotton Depo., p. 57.)

Defendant Cotton was aware that there were no mental health providers on-site at the Jail and that, instead, the on-call mental health provider was Pathways; she had called Pathways in the past when necessary for an inmate. (Cotton Depo., pp. 18, 45.) The jury could find that, despite her training that violent, combative, and self-harming behavior should result in a call to Pathways, she did not call the crisis line to prompt a mental health evaluation or treatment for Plaintiff.

Later that day, Cotton learned that Defendant Staten had spoken with Mr. Yarbrough and that Mr. Yarbrough informed Staten that Plaintiff had been acting abnormally since April 28, 2020, and that they had planned to take Plaintiff to Lakeside Hospital. (Cotton Depo., pp. 64-65.) Mr.

41

Yarbrough called Cotton to inquire about Plaintiff, but she refused to speak to him due to HIPAA concerns and did not log the call. (Cotton Depo., pp. 65.) The jury could find that, despite this information, Cotton did not call Pathways to request a mental health evaluation for Plaintiff.

On May 17, 2020, at approximately 6:00 a.m., when Cotton reported for her shift, she noted Plaintiff had swelling around his collarbone but did not recall notifying the nurse of her observation. (Cotton Depo., pp. 68, 74.). At approximately 11:20 a.m., Nurse Davis advised that Plaintiff needed to be transported to the JMCGH emergency room, and Cotton was to coordinate transport. (Davis Depo., p. 76; Davis Progress Notes - Bates No. 000027-000029, ECF No. 57-27). Although Jail policy requires that responses to health care emergencies should be three minutes or less, and that all transports to the emergency room should be via ambulance, she failed to call for that transport.

At 12:30 p.m., Cotton noted that Plaintiff's neck was "severely swollen," but she did not call for emergency medical transport, something she may do without prior authorization. (Jail Incident Report - Bates No. 000014, ECF No. 57-24; Stegall Depo., p. 78, ECF No. 57-13.) Instead, approximately fifty-seven minutes later, deputies departed to transport Plaintiff to the Jackson-Madison County General Hospital emergency room via squad car.

Defendant Wendi Eitleman worked the day shift on May 16, 2020, and was assigned to the booking area. There is evidence that, upon arrival, she received an oral report of what happened on the prior shift and reviewed documents completed on the prior shift, including the jail incident report, restraint chair forms, observation logs, and Plaintiff's booking report. (Eitleman Depo., pp. 31-34, ECF No. 52-6.)  The jury could find that, from this review, she knew that Plaintiff came into custody under a psych hold and that he ran into the sally port door and was placed in the restraint chair on the prior shift.  She understood that a "psych hold" meant that the arresting officer

believed something was "off" with the inmate and that the inmate should be evaluated by mental health professionals who would determine if admission to a mental health facility was warranted. (Eitleman Depo., pp. 17-18.)

Eitleman knew that it was the booking officer's duty to call Pathways for an inmate under a psych hold but did not recall asking Simpson if he had placed the call. (Eitleman Depo., pp. 29-30, 41.) She would ordinarily review the shift logs to see if the call had been placed and, if it had not, she would place the call. (Eitleman Depo., pp. 29-30;40-41.) However, Eitleman did not contact Pathways to notify them of the psych hold and request an examination.

Shortly after the beginning of Eitleman's shift, Plaintiff began hallucinating and taking a running start and ramming the cell door as if he was trying to go through it. (Eitleman Depo., pp. 49-51; Stegall Depo., pp. 79-81.) This behavior culminated with Plaintiff receiving two bursts of chemical spray and being placed in the restraint chair for a second time for being a danger to himself. (Eitleman Depo., pp. 53-54.) Once in the restraint chair, Plaintiff repeatedly made delusional statements, which were logged by Eitleman. (Eitleman Depo., pp. 58, 91; Restraint Chair Logs - Bates No. 00009-000010, ECF No. 57-22.) Although Eitleman notified Nurse Davis about Plaintiff's being placed in the restraint chair, Plaintiff "freaked out" and refused to allow Nurse Davis near him because he believed she was going to execute him with a thermometer he believed was a gun. (Eitleman Depo., pp. 68-69.)

The jury could find that Eitleman knew that hallucinations and attempts at self-harm were signs of mental illness and that she was trained that violent, combative, and self-harming behavior should prompt a call to Pathways, yet she failed to call. (Eitleman Depo., pp. 52- 53; Bausman 30(b)(6) Depo., pp. 23-24.) Eitleman did not receive or rely on any instructions from Nurse Davis or any other medical professional about Plaintiff's mental health or physical health outside of

receiving a Bandaid and Neosporin for his injured toenail because "he wouldn't let nobody get close to him, really." (Eitleman Depo., pp. 88-89.)

Defendant Cordero Staten worked the May 16, 2020 day shift. He had known Plaintiff since he was a child due to a familial relationship between their parents. At shift change, Simpson relayed to all incoming shift members, including Staten, that Plaintiff was under a psych hold and that he had to be placed in the restraint chair, and Simpson instructed the incoming staff to read his incident report. (Simpson Depo., p. 48; Staten Depo., p. 36, ECF No. 57-11.) Staten understood a "psych hold" to implicate an inmate's mental health and that the inmate would be held "until . . . he gets help — the help he needs." (Staten Depo., pp. 18-20.) The jury could find that Staten was aware that, when an inmate comes in on a "psych hold," Pathways should be called immediately, without delay of a day or even hours. (Staten Depo., p. 53.)

Although Staten had never known Plaintiff to suffer from mental health or drug issues, he appeared "out of it" when he first interacted with him on May 16 at 6:00 a.m. (Staten Depo., pp. 16, 22-24.)

At approximately 7:40 a.m., Cotton requested that Staten assist with placing Plaintiff in the restraint chair because he was "hitting his head on the door." (Staten Depo., pp. 28-30.) Once Staten arrived at booking, he observed Plaintiff taking a running start and hitting the door with his head and shoulders, "completely over and over." (Staten Depo., p. 30; Jail Incident Report - Bates No. 000018, ECF No. 57-26.) Staten and Cotton used two bursts of chemical spray to subdue Plaintiff, and then he, Eitleman, Cotton, and Stegall placed Plaintiff in the restraint chair. (Staten Depo., pp. 31-32; Jail Incident Report - Bates No. 000018.) Following the incident, it was discovered that Plaintiff had urinated and defecated on himself.

After Plaintiff was in the restraint chair, Staten called Mr. Yarbrough "because of concern" for Plaintiff and told him Plaintiff was "acting crazy." (Staten Depo., pp. 33-34.) At that time, Staten learned that Plaintiff had been acting abnormally since April 28, 2020, and that, prior to his arrest, the family's plan was to take Plaintiff to Lakeside Hospital on May 16, 2020. At various points while Plaintiff was in the restraint chair for five hours and twenty minutes, Staten logged Plaintiff making delusional statements. (Restraint Chair Logs - Bates No. 00009-000010; Staten Depo., pp. 45-46.) Staten was trained to call Pathways when an inmate engaged in self-harming behavior or was violent or combative. (Bausman 30(b)(6) Depo., pp. 23-24.) The jury could find that, although Staten witnessed self-harming behavior and knew Plaintiff's family's plan to take him to a mental health hospital, Staten did not call Pathways.

Defendant Taylor Stegall reported for his shift on May 16, 2020, at 6:00 a.m. He was aware that Plaintiff was subject to a psych hold, which meant that Plaintiff had attempted to harm himself or threatened suicide. (Stegall Depo., p. 15.) Stegall was called to assist with placing Plaintiff in the restraint chair. (Staten Depo., pp. 29-30.) When he arrived, he found Plaintiff taking a running start and running "full speed" into the [steel] door of the cell, as if he was trying to push through the door. (Stegall Depo., pp. 79-81.) He believed that Plaintiff was hallucinating. (Stegall Depo., pp. 80-81.) Stegall was aware that the symptoms of intoxication and mental illness could overlap and that he was not qualified to determine the underlying cause of the symptoms; instead, that would require the assessment of a qualified mental health professional. (Stegall Depo., pp. 47-48.) He was trained that self-harming or combative behavior should result in a call to Pathways for an evaluation and stabilization. (Bausman 30(b)(6) Depo., pp. 23-24.) He knew that Pathways was the sole mental health provider for the Jail and that correctional officers could call Pathways when needed. (Stegall Depo., pp. 25-26, 50.) Despite this knowledge, he failed to call Pathways.

Plaintiff's ramming his head into the steel door gave Stegall concern for Plaintiff's health because such acts could result in a life-threatening injury. (Stegall Depo., pp. 43, 82.) Stegall knew that Nurse Davis attempted to observe Plaintiff's eyes and check his vital signs but was unable to complete any of those tasks or examine him in a meaningful way. (Stegall Depo., p. 88.) Stegall received no instructions regarding Plaintiff's physical or mental health from Nurse Davis. (Stegall Depo., pp. 88-89.) The jury could find that Stegall could summon emergency medical attention without prior authorization, but he failed to seek any evaluation of Plaintiff's physical condition on May 16, 2020.

Stegall also worked at the Jail on May 17, 2020, and was called to assist with preparing Plaintiff for transport to the emergency room. (Stegall Depo., p. 93:11-18). Upon responding, he saw Plaintiff had a "large bulge" or "very, very large knot" on his neck. (Stegall Depo., pp. 93-94.) Despite the fact that Jail Policy required responses to health care emergencies to be no more than three minutes and all transport to the emergency room be made by ambulance, Stegall did not call for emergency transport, even though he was authorized to do. (Stegall Depo., pp. 54, 62-63, 78.)

Defendant Jackie Bausman supervised the sergeants/shift commanders and correctional officers. Her typical hours of work were Monday through Friday from 8:00 a.m. until 4:00 p.m., and on-call on the weekends, as needed. Among the responsibilities of the Jail staff was to keep inmates safe, including protecting them from self-harm. (Bausman Depo., pp. 44-45, ECF No. 57-6.) Correctional staff are trained to recognize symptoms of mental illness, including delusional statements, hallucinations, violent behavior, and attempts at self-harm. (Bausman Depo., pp. 42-43.) Bausman was aware that violent and self-harming behavior, as well as mental illness, can be a health care emergency. (Bausman Depo., p. 46.) It was known by jail staff that Pathways was

46

the on-call mental health provider and correctional staff could call the hotline freely as needed. (Bausman Depo., p. 23.)

The jury could find that Bausman was made aware of Plaintiff's volatile behavior multiple times throughout the weekend, as she received calls "from several officers over the weekend" about him. (Bausman Depo., pp. 15, 26.) She was aware that he had been placed in the restraint chair; that he was running into the wall, door, and window and hit the cell door with his body; and that he was suspected of having a broken wrist. (Bausman Depo., pp. 15, 18, 20.) "Anytime something happens . . . as extreme as an inmate running into a door, [the correctional staff] let [her] know." (Bausman Depo., p. 13.) Based upon the information she received, Bausman deemed Plaintiff a threat to himself. (Bausman Depo., p. 21.) The jury could find that, despite this knowledge and her training that violent, combative, and self-harming behavior should result in a call to Pathways, Bausman did not contact Pathways at any point over the weekend of May 15-17, 2020.

On May 17, 2020, at 11:20 a.m. Nurse Davis called Bausman to advise her that Plaintiff needed transport to the emergency room. (Davis Progress Notes - Bates No. 000028). Although Bausman knew that responses to health care emergencies should occur within three minutes and that transports to the emergency room were to be by emergency medical service, she did not advise staff members to call for an ambulance. Instead, Defendant Cotton arranged transport by squad car, and the transport did not occur until more than two hours after the order was made to send Plaintiff to the emergency room.

Defendant Jessilynn Marshall was the shift commander of the May 16, 2020 night shift and was assigned to work in the booking area where Cell 257A was located. As part of her duties at shift change, she spoke with the prior shift's booking officer and reviewed documents completed

during that shift. (Marshall Depo., p. 14, ECF No. 57-3.) Additionally, Staten told her that Plaintiff had run his head in the door, urinated and defecated on himself, and had to be chemical sprayed earlier in the day. (Staten Depo., pp. 54-55.)

Marshall testified in her deposition that she knew that Plaintiff was under a psych hold, which she understood to indicate that the individual was suicidal and/or had a mental illness. (Marshall Depo., p. 16.) Marshall was trained to recognize symptoms of mental illness, including delusional thoughts, hallucinations, violent behaviors, and attempts at self-harm. (Marshall Depo., pp. 33-34.) She was also trained to call Pathways, the on-call mental health provider, if she suspected mental illness in an inmate or if the inmate attempted self-harm. (Marshall Depo., pp. 23-24; 34-36; Bausman 30(b)(6) Depo., pp., 23-24.)

During her shift, Marshall made a Jail Incident Report to document Plaintiff's behavior, which included "crying, yelling [nonsensically], and hitting the door," off and on throughout her twelve-hour shift. (Marshall Depo., p. 64.) She observed Plaintiff hitting the door with his fist and head more than ten times, and his hand became so swollen from hitting the door that she feared it was broken. (Marshall Depo., pp. 60, 68.)  Although she was trained to call both Bausman and the on-call nurse if she had a concern about an inmate's physical health, she only called Bausman to report the injury to Plaintiff's hand. (Marshall Depo., pp. 23, 68-69.) She did not recall receiving any instructions from Bausman as to what actions to take on Plaintiff's behalf, but if she had received instructions, such as to call the nurse or 911, it would have been noted in her report. (Marshall Depo., pp. 69-70.) She received no instructions from any medical professional upon which she relied regarding Plaintiff. (Marshall Depo., p. 74.) The jury could find that Marshall did not call Pathways despite the fact that Plaintiff was expressing delusional thoughts, violent behaviors, and self-harming behavior, all known signs of mental illness.

Taking the facts in a light most favorable to Plaintiff, he has pointed to evidence in the record from which the jury could find that the individual Defendants recklessly failed to act with reasonable care in failing to render or seek any mental health assistance for him until he was transported to the emergency room on the afternoon of May 17, 2020, despite symptoms of delusion, hallucinations, and self-harm, most notably ramming his head into the steel door of this cell. There is evidence in the record, as delineated above, that the individual Defendants were aware of and ignored the risk of Plaintiff's continued actions of self-harm. Additionally, the jury could find that Defendant Officers were deliberately indifferent by failing to call an ambulance to transport Plaintiff and/or waiting to transport him in a patrol car. All of this evidence combined, viewed in the light most favorable to Plaintiff, could lead the jury to find that the actions of the officers show that they knew that Plaintiff was suffering from a serious medical need that posed an excessive risk to his health and that not calling for emergency services sooner would create an unjustifiably high risk of harm to Plaintiff and yet they ignored that risk until it was too late.

Defendants contend that the individual county officers did not know about Plaintiff's mental health issues. However, a jury could find that, based on Plaintiff's erratic behavior as he was being booked at the Jail, the officers should have been alerted to possible mental health issues.

Defendants attempt to rely on the case of *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017), in support of their argument that they are entitled to qualified immunity. In *Anderson-Bey*, the Sixth Circuit noted that the constitutional right to medical and psychiatric treatment does not mean that every case involving those rights establishes a clearly established right for qualified immunity purposes. *Id.* at 992. In that case, the detainee's behavior while in the jail included: (1) kicking and throwing paint cans; (2) claiming that his "father was the son of Satan;" (3) kicking the door of the interview room; (4) rambling nonsensically about his million-

dollar music contract; (5) shaking his penis and asking if an officer wanted to "hold it"; and (6)

choking officers. *Id.* at 991-92. In holding that the officers were entitled to qualified immunity, the

Court reasoned:

> Even if the jail officers knew that Omar [Anderson-Bey] was bipolar and
> delusional, no clearly established law required them to do more than what they did:
> They kept him in seclusion for everyone's safety, waited until he was calm to feed
> him and book him, asked him about any psychiatric diagnoses during the medical
> screening, and after eight hours of detention uncuffed him and released him from
> his cell to make a call to be released on bail.

*Id.* at 994.

*Anderson-Bey* is inapposite to the present case because, in that case, the detainee did not

commit acts of self-harm such as running into a steel door or beating his head against the cell door.

No evidence was presented from which a jury could have found that the officers recklessly

disregarded the risk of harm to the detainee's mental and/or physical health. The *Anderson-Bey*

Court specifically found that "there was nothing to suggest he was at risk of the heart attack that

ended up killing him." *Id.* In this case a jury could find that, even though Defendant Officers

knew of Plaintiff's need for mental health help as manifested by his acts of self-harm and

delusions, they did nothing to get Plaintiff that help until his physical injuries had manifested.

Moreover, in *Anderson-Bey*, the detainee was only held eight hours. Here, Plaintiff was

held approximately forty hours before being taken to the emergency room – during which time

Plaintiff continued to harm himself.

Finally, the Court must look at the issue of causation. Defendants allege that Plaintiff has

failed to a show that the damages that he suffered resulted from act or omission of individuals at

the Jail because he has not provided the testimony of an expert on this issue. *See Sears v. Bates*,

2020 WL 5996419, at *13 (E.D. Ky. Oct. 9, 2020) (quoting *Alberson v. Norris*, 458 F.3d 762,

765–66 (8th Cir. 2006) (holding that, in § 1983 context, if medical question "is not within the

realm of lay understanding," *i.e.*, concerns a matter regarding a prisoner' "sophisticated medical condition," then "expert testimony is required to show proof of causation.").

Plaintiff acknowledges that proximate causation is an essential element of a Section 1983 claim for damages. "[A] violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 661 (6th Cir. 1994) (citing *Doe v. Sullivan Cnty., Tennessee*, 956 F.2d 545, 550 (6th Cir. 1992)). However, the alleged indifference need not be the sole cause of the harm; rather, it is a proximate cause "if it [was] a substantial factor in the sequence of responsible causation." *Parsons v. Caruso*, 591 F. App'x 597, 604 (6th Cir. 2012) (citing *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 620 (6th Cir. 2002) (internal citations omitted).

> "An injury is proximately caused by an act when it appears from the evidence in the case that the defendant's conduct was a substantial factor in bringing about the plaintiff's harm, and no rule of law relieves the defendant from liability because of the manner in which his conduct resulted in the harm." *Hickerson v. Koepp*, Nos.95-1890, 95-1982, 1997 WL 56961, at *3 (6th Cir. Feb.10, 1997). An action or inaction need not be the sole cause of an injury to constitute a proximate cause, as there can be more than one proximate cause of an injury. *Id.*, 1997 WL at *41997 WL at *4. The plaintiff bears the burden of proving, by a preponderance of the evidence, that the defendant's conduct was a proximate cause of the injury. *Id.*, 1997 WL at *31997 WL at *3 (citing *Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969, 971 (6th Cir.1994)). Common law, however, dictates that, unless the uncontroverted facts make the answer so clear that all reasonable persons must agree on the outcome, the question of proximate cause is generally one for the jury. *Kellner v. Budget Car & Truck Rental, Inc.*, 359 F.3d 399, 406 (6th Cir. 2004) (citing Tennessee law); *Hunley v. DuPont Automotive*, 341 F.3d 491, 500 n. 5 (6th Cir.2003) (citing Michigan law).

*Warrick v. Walker*, 2006 WL 140720, at *5 (M.D. Tenn. Jan. 17, 2006).

To avoid summary judgment, a plaintiff "must, at a minimum, come forward with such evidence that a reasonable juror could find by a preponderance of the evidence to a reasonable medical probability that the alleged constitutional violation" caused the plaintiff's injury. *Alford*

*v. Mohr*, 2020 WL 1187427, at \*4 (S.D. Ohio Mar. 12, 2020), rep. & rec. adopted, 2020 WL

1853687 (S.D. Ohio Apr. 13, 2020).

In *Woodley v. City of Memphis, Tenn.,* 479 F. Supp. 2d 756, 764 (W.D. Tenn. 2006), the

Court explained that:

> The Sixth Circuit has held that in certain circumstances where the "need for medical
> care [is] obvious ... [the plaintiff] need not prove that the officers' acts or omissions
> were the proximate cause of" the injury. *Estate of Owensby* [*v. City of Cincinnati*],
> 414 F.3d [596, 604 (6th Cir. 2005)]. The court distinguished between two general
> sets of circumstances involving the alleged need for medical care. In one, the
> "affliction is seemingly minor or non-obvious." *Id.* In such circumstances, "medical
> proof may be necessary to assess whether the denial of medical care caused a
> serious medical injury." *Id.*
>
> The other category includes circumstances "where the individual had a serious need
> for medical care that was so obvious that even a layperson would easily recognize
> the necessity for a doctor's attention." *Id.* (internal quotations omitted). Medical
> proof of causation is not required in such a situation. *Id.*

In looking at the kind of proof needed to establish causation, the *Alford* Court found that

the plaintiff had "failed to adduce evidence creating a genuine issue of fact on the causation

element of his § 1983 claim." *Id.*

> Assuming for purposes of the motion for summary judgment that defendant Malott
> released refrigerant into the atmosphere of the prison, which posed a risk of harm
> to plaintiff, plaintiff has nevertheless failed to demonstrate that Malott's actions
> were the proximate cause of his injuries. None of plaintiff's medical records during
> or subsequent to the time he worked with defendant Malott show any connection
> whatsoever between plaintiff's eye conditions and exposure to refrigerants.
> Plaintiff's conclusory allegation of causation, which is premised on his assertion
> that he only began suffering from eye maladies after he stopped working for
> defendant Malott in October 2013, is insufficient to establish the requisite
> proximate cause.

*Alford*, 2020 WL 1187427, at \*4 Here, the jury could find that Plaintiff's medical records from

JMCGH and VUMC do show a connection between his injuries and the delay in treatment.

Evidence that Plaintiff had no apparent injuries when he arrived at the Jail and his injuries became

apparent while he was incarcerated supports that connection. The jury could look at the following

52

evidence, which if believed, would establish the requisite causal connection, that is, that Plaintiff's untreated mental illness led to self-harm resulting in serious physical injury.

Plaintiff was brought directly from his home to the Jail and physically appeared "okay" to Simpson. Immediately upon arrival, Plaintiff was placed in the restraint chair where he remained for four hours and forty-seven minutes. After being released from the restraint chair, Plaintiff was placed in Cell 257A, a one-man cell, and was there until he was placed in the restraint chair a second time on the morning of May 16, 2020.

There is evidence that Plaintiff's neck began to swell either during the night shift of May 16-17 or at or around shift change on May 17, 2020. Staten testified that Plaintiff's neck was not swollen when he left his shift at 6:00 p.m. on May 16, 2020, while both Owen and Cotton noticed swelling around 6:00 a.m. the next day. At 12:30 p.m. on May 17, Cotton noticed the swelling of Plaintiff's neck and collarbone was "severe."  When Nurse Davis came to observe the swelling, she thought that Plaintiff "hurt his neck from running his head and shoulders into the cell door," an opinion with which Cotton agreed. (Cotton Depo., pp. 80-81.) Staten and another deputy transported Plaintiff for emergency medical treatment.

Upon arrival at the JMCGH emergency room, Defendant Owen met the transporting officers and observed that Plaintiff's neck was "a lot more swollen than it was when [he] left" at 6:00 a.m. that morning. (Owen Depo., p. 99.) By the time Owen saw Plaintiff at the emergency room, his neck was swollen so significantly it was comparable to a "horse collar" and prevented Plaintiff from moving his head. (Owen Depo., p. 100.) At the hospital, a nurse questioned Staten whether Plaintiff had been beaten in the Jail, and Staten responded that the injuries resulted from self-harm. (Q: Can you point to anything else that happened to Plaintiff Yarbrough while he was

incarcerated that landed him in the emergency room other than his self-harm?  A: No, ma'am. (Staten Depo., pp. 92-93.))

JMCGH records show that Plaintiff presented with an altered mental status, a psychiatric problem, and agitation with a reported onset date of May 15, 2020. At the time of admission, Plaintiff was confused, hostile, and paranoid and was unaware of his age or his then present location. A differential diagnosis was established that included schizophrenia, alcohol intoxication, drug abuse, hallucination, and psychosis; however, a urinalysis drug screen performed in the emergency department was negative for all tested drugs and alcohol with the exception of cannabinoids. Plaintiff had to be medically restrained in the emergency department and required treatment with an antipsychotic drug.

Plaintiff was diagnosed with traumatic subcutaneous emphysema and pneumomediastinum that presented as extensive air under the skin at his ears, neck, chest, abdomen, and upper legs bilaterally. It became medically necessary to take life saving measures, and Plaintiff was intubated, and ultimately he was transferred via ground ambulance to VUMC for further treatment.

VUMC records show that Plaintiff was diagnosed with bipolar disorder, with then current episode manic severe with psychotic features, problems present upon admission. It was also noted that Plaintiff presented from jail to JMCGH with altered mental status, agitation, and self-harming behaviors, specifically throwing himself into a wall repeatedly. When admitted at VUMC, he required medical restraints, as well as treatment with several mental health medications.

The history provided by emergency medical services to VUMC indicated Plaintiff was incarcerated when he became violent and began throwing himself into the wall repeatedly and that guards noticed he had an altered mental status, causing him to be evaluated at an outside facility. At VUMC, Plaintiff was treated for acute respiratory failure with hypoxia, a traumatic

54

pneumothorax, and subcutaneous air. The mechanism of injury was listed as "self-inflicted blunt force trauma."

Defendants argue that, despite this evidence, Plaintiff has not pointed to facts which, if believed by the jury, would show that his injuries arose while he was incarcerated. According to Defendants, Plaintiff's injuries "could have just as easily occurred before Plaintiff entered the Jail, for instance, when Plaintiff was taken to the ground and arrested, but then not have manifested itself via swelling until two days later." It is possible that the jury would agree with Defendants. However, there is enough evidence in the record from which the jury could make the opposite finding – that Plaintiff's acute respiratory failure with hypoxia, a traumatic pneumothorax, and subcutaneous air resulted from his acts of self-harm given that he showed no injuries when he arrived at the Jail and that the officers noticed his neck gradually swelling while he was in the Jail and that ultimately it appeared as if he was wearing a "horse collar."

Because "the uncontroverted facts" do not "make the answer so clear that all reasonable persons must agree on the outcome," *Warrick*, 2006 WL 140720, at *5, the Court finds that "the question of proximate cause" in this case must be decided by the jury.

For these reasons, summary judgment is denied on Plaintiff's medical indifference claim against the individual officer defendants.

In conclusion, Defendants' motion for summary judgment is **GRANTED** as to Defendant Henderson County. The motion is also **GRANTED** to the extent that Plaintiff asserts that Defendant Officers were deliberately indifferent to his serious physical needs. Defendants' motion

for summary judgment as to Defendant Officers is **DENIED** on the claim that Defendant Officers

were deliberately indifferent to Plaintiff's serious mental health medical needs.

**IT IS SO ORDERED.**


s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  February 6, 2023.